**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEANNE LAFRANTZ, | |
| Plaintiff, | |
| v. | **1:21-cv-04920-FB-CLP** |
| ST. MARY'S ROMAN CATHOLIC | |
| CHURCH, THE DIOCESE OF BROOKLYN, | |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE

## TO DEFENDANTS' MOTIONS TO DISMISS

**Law Office of Darren Wolf, P.C.**
Ashley M. Pileika
New York Bar No. 974605
ashley@darrenwolf.com
Darren Wolf*
Texas State Bar No. 24072430
darren@darrenwolf.com
1701 N. Market St., Suite 210
Dallas, Texas 75202
P: 214-346-5355
F: 214-346-5909

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT……………………………………………………………….3

ARGUMENT…………………………………………..…………………………………...….5

I.      THE AMENDED COMPLAINT DOES NOT RUN AFOUL TO F.R.C.P. 8…………5

II.     ALL OF PLAINTIFF'S CLAIMS ARE WELL-PLEADED AND PREVAIL PAST
        *TWIQBAL'S* PLAUSIBILITY THRESHOLD……………………………………….7

        A. Plaintiff States Claims for Negligence and Gross Negligence………………….…..8

        B. Plaintiff States a Claim for Negligent Training/Retention/Supervision……..……....13

        C. Plaintiff States a Claim for Premises Liability…………..………………………..19

        D. Plaintiff States a Claim for Breach of Fiduciary Duty…………………….………..20

CONCLUSION………………………………………………………………..………21

## PRELIMINARY STATEMENT

Plaintiff Jeanne LaFrantz ("Plaintiff" or "Jeanne") submits this Memorandum of Law in opposition to Defendants' Motions to Dismiss the First Amended Complaint ("FAC").

This case was filed pursuant to the New York Child Victims Act (L 2019, ch 11) ("C.V.A.") for sexual abuse Jeanne was subjected to by Father John F. Campbell ("Father Campbell") a priest under the Diocese of Brooklyn assigned to St. Mary's, when Jeanne was a student and minor parishioner at St. Mary's. FAC at ¶ 15-17. The incidents of abuse began when Jeanne was only ten years old and continued for approximately six years. FAC at ¶¶ 1-5.

When Jeanne was in sixth grade, Father Campbell began calling Jeanne to his private quarters in St. Mary's Rectory three or four afternoons a week under the guise of running errands for him. *Id.* at ¶¶ 28-29. It was only a short walk from Jeanne's home to St. Mary's; on the way there and back, Jeanne passed in front of the convent where the nuns—who were also Jeanne's teachers at St. Mary's—resided. *Id.* at ¶ 29; Exhibit 1 to FAC.

Once Jeanne was outside the rectory, she rang a doorbell to alert St. Mary's housekeeper she had arrived; because Jeanne was summoned to the St. Mary's rectory so often, the housekeeper instantly recognized Jeanne and allowed her to take the housekeeping's shorter passageway upstairs—as opposed to the longer route other visitors took. *Id.* at ¶¶ 34-36; Exhibit 1 to FAC.

Once upstairs, Father Campbell came to retrieve Jeanne from the communal sitting area, where other priests and visitors would be present, and then proceed to bring Jeanne to Father Campbell's private quarters, where he had a bar and sleeping area/bed. *Id.* at ¶¶ 37-40.

Sister Mary Anselm, Jeanne's sixth grade teacher, noticed a major change in Jeanne's behavior once Jeanne started spending afternoons alone with Father Campbell; for the first time, Jeanne started "acting up" in class. *Id.* at ¶¶ 30-33.

The Defendants do not dispute the horrific nature of the acts of child sexual abuse Jeanne suffered. For six years, Father Campbell used his position of power as a priest to meet, groom, and molest Jeanne—and likely other students and minor parishioners at St. Mary's. *Id.* at ¶¶ 3, 49.

The Diocese of Brooklyn and St. Mary's maintained special relationships with Jeanne as a student, invitee, and minor parishioner. *Id.* at ¶¶ 75, 88, 100, 103, 115. Defendants breached the duty of care they owed to Jeanne by failing to warn and protect Jeanne from abuse, as well as failing to control Father Campbell's dangerous proclivities and acts, which Defendants knew, or should have known, about. *Id.* at ¶¶ 60, 63, 75, 76, 78.

Jeanne revealed she was sexually abused by Father Campbell during confessional at Mater Christi Diocesan High School. The priest receiving Jeanne for confessional admonished her for "lying" about a priest and told Jeanne she would go to Hell for her shameful behavior. *Id.* at ¶¶ 51-56. Though this happened "after the fact," it is an important piece of evidence that speaks to the scare tactics used to silence victims like Jeanne in the 1960s, along with the Diocese of Brooklyn's systematic coverup of child sexual abuse and protection offered to predators, like Father Campbell. *Id.*

Defendants now move to dismiss Plaintiff's FAC in its entirety. The Diocese of Brooklyn argues the FAC runs afoul to F.R.C.P. 8 because it alleges "Defendants," as opposed to stating "the Diocese of Brooklyn *and* St. Mary's" throughout. Both Defendants argue Plaintiff has failed to state any claims that survive *Twiqbal's* plausibility requirement.

Despite an outpouring of recent C.V.A. decisions—many of which the Diocese of Brooklyn is a party to—Defendants discuss very few in their motions. And neither the Diocese of Brooklyn nor St. Mary's apply this Court's findings in *Zimmerman v. Poly Prep Country Day Sch.*, to the facts at issue here. 888 F. Supp. 2d 317 (E.D.N.Y. 2012).

Plaintiff respectfully requests the Court deny Defendants' motions and afford Jeanne—a survivor of child sexual abuse, who has suffered silently for many decades—a fair and full opportunity to obtain discovery in this case. As discussed herein, Plaintiff's FAC both comports with F.R.C.P. 8 and states claims for (1) negligence, (2) gross negligence, (3) negligent supervision/retention/hiring, (4) premises liability, and (5) breach of fiduciary duty.

## ARGUMENT

### I.   THE AMENDED COMPLAINT DOES NOT RUN AFOUL TO F.R.C.P. 8.

Uniformly naming two defendants throughout a complaint for their shared wrongdoing, as Plaintiff does here, does not run afoul to F.R.C.P. 8. Even if the Diocese of Brooklyn and St. Mary's are separate entities, this by no means suggests each entity's liability must be kept "separate" and Defendants cannot be held jointly liable for the abuse described herein. Defendants do not get a free pass because they incorporated St. Mary's as a separate corporate entity from the Diocese of Brooklyn—St. Mary's is indisputably a religious entity within the Diocese of Brooklyn, which operates both a parish and a school.

Though "a complaint must 'give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests,'" there is "[n]othing in Rule 8 [that] prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *New York Am. Water Co., Inc. v. Dow Chem. Co.*, No. 19CV2150NGRLM, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020) (internal citations omitted).

*Bardwil Indus. Inc. v. Kennedy*, the case the Diocese of Brooklyn relies on to argue improper group pleadings "is inapposite because [it does] not involve identical allegations against named defendants." *Id.* There, three former officers of a textile company were sued in their

individual capacity for self-dealing and a series of wrongful events that led to the company being wound down. *Bardwil Indus. Inc.*, No. 2020 WL 2748248, at *3. "[G]roup pleading failed to distinguish among the conduct of . . .  individuals, where the claim, which related to mismanagement of a business, turned specifically on each defendant's distinct duties and actions." *New York Am. Water Co., Inc. v. Dow Chem. Co.*, No. 19-CV-2150, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020).[1] *See also Douek v. Citibank*, No. 20-CV-8074, 2021 WL 3604761, at *1 (S.D.N.Y. Aug. 12, 2021) (discussing each defendant in *Bardwil Indus. Inc.* "was 'left to guess not only which factual contentions [were] asserted against him, but also which of those contentions [were] the basis for [the] plaintiff's claims and noting that '[s]uch guesswork is antithetical to the fair notice that Rule 8 requires'").

The FAC states Father Campbell was under the shared direction, control, employ, and supervision of the Diocese of Brooklyn and St. Mary's when he sexually abused Jeanne. The educational facilities and premises of St. Mary's—where Father Campbell was given unfettered access to and repeatedly sexually abused Jeanne—were also under Defendants' shared direction,

---

[1] Throughout the FAC, Jeanne alleges the Diocese of Brooklyn and St. Mary's acted in unison and jointly employed and controlled Father Campbell and the premises of St. Mary's and are, therefore, jointly liable.

Compare with the allegations in *Bardwil Indus. Inc.* which describes distinct acts committed by individual defendants but fails to identify ***which defendants*** undertook ***which acts***. *See, e.g., Bardwil Indus. Inc.*, 2020 WL 2748248, at *3 ("not a single allegation specifies which defendant engaged in what misconduct. Instead, each allegation ambiguously asserts that "[d]efendants" carried out the alleged wrongdoing. For example, . . . "[d]efendants ordered all of the[ ] assets to be moved from the Columbus warehouse," . . . "[d]efendants liquidated the inventory" in the Dallas warehouse, . . . "[d]efendants failed to pay the licensing fees due to Lenox," . . . "[d]efendants orchestrated and participated in moving the License to Arlee," . . .  "[d]efendants" "fail[ed] ... to engage an independent auditor," . . .  "[d]efendants" did not provide bank statements to Hertz Herson).

control, and supervision. Therefore, Jeanne states five viable claims against both the Diocese of Brooklyn and St. Mary's (i.e., "All Defendants").

## II.    ALL OF PLAINTIFF'S CLAIMS ARE WELL-PLEADED AND PREVAIL PAST *TWIQBAL'S* PLAUSIBILITY THRESHOLD.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *C.Q. v. Est. of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *2 (S.D.N.Y. Oct. 21, 2021) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)).

"In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Id.* (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Plaintiff's FAC "does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).

Jeanne has far surpassed *Twiqbal's* plausibility standard and stated claims for (1) negligence, (2) gross negligence, (3) negligent training/supervision/retention, (4) premises liability, and (5) breach of fiduciary duty.

**A.  <u>Plaintiff States Claims for Negligence and Gross Negligence</u>.**

Plaintiff alleges Defendants—both the Diocese of Brooklyn and St. Mary's—owned and operated St. Mary's and employed priests at the school and parish, including Father Campbell. FAC at ¶ 15-17. The FAC also states Father Campbell was a priest under the Diocese of Brooklyn—and thereby under the diocese's control, direction, and employ. *Id*. at ¶¶ 5, 15, 78, 84. Plaintiff, therefore, has clearly stated St. Mary's is a parish and school within the control, direction, and supervision of the Diocese of Brooklyn. Together, Defendants were charged with operating, controlling, directing, and staffing St. Mary's—in addition to educating, supervising, and ensuring the safety of St. Mary's students. *Id*. at ¶¶ 5, 6, 15, 78, 84, 104. New York courts have reached this same conclusion—that the Diocese of Brooklyn jointly owns and/or operates schools and parishes—in several other cases. *See, e.g., Caroleo v. Roman Catholic Diocese of Brooklyn,* 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021); *DiGiorgio v. Roman Catholic Diocese of Brooklyn*, 2021 N.Y. Slip Op. 31378 (N.Y. Sup. Ct. 2021).

The Diocese of Brooklyn correctly states "[a]n action for negligence does not lie unless there exists a duty on the part of the defendant and a corresponding right in the plaintiff." *Cohen v. Wales,* 518 N.Y.S.2d 633, 634 (1987). But the diocese wrongly argues it had no special relationship with Jeanne, and, therefore, owed her no duty to control Father Campbell and protect her from his harmful conduct. Both the Diocese of Brooklyn and St. Mary's maintained a special relationship with Jeanne—as a student and an invitee.[2]

First, a school and its educators owe students a duty to "exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." *Zimmerman v. Poly*

---

[2] The Defendants had a fiduciary relationship with Jeanne, discussed in sub-section "D" ("Plaintiff States a Claim for Breach of Fiduciary Duty"), which created an additional duty to warn, protect, and disclose incidents of sexual abuse to her, which they also breached.

*Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Hoose v. Drumm*, 281

N.Y. 54, 57–58 (1939)); *see also Garcia v. City of N.Y.*, 646 N.Y.S.2d 508, 509 (1st Dep't 1996)

("This duty [of care] derives from the fact that the school, once it takes over physical custody and

control of the children, effectively takes the place of their parents and guardians"). It is well settled

that "[i]n New York, schools are under a special duty of *in loco parentis,*" PC-41 *Doe v. Poly Prep*

*Country Day Sch.*, 20-CV-03628, 2021 WL 4310891, at *12 (E.D.N.Y. Sept. 22, 2021). Both

Defendants, therefore, maintained a "special relationship" with Jeanne and a duty to act *in loco*

*parentis*.

Second, the Diocese of Brooklyn and St. Mary's also maintained a special relationship with

Jeanne as an invitee on property they owned and operated. FAC at ¶ 115. In *Caroleo v. Roman*

*Catholic Diocese of Brooklyn*, Judge Silver denied the Diocese of Brooklyn's motion to dismiss

the negligence claims of a plaintiff who was molested by the dean of St. Francis Preparatory

School. 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021). Judge Silver held the Diocese and the

Franciscan Brothers "owed a duty of care to plaintiff because, among other things, plaintiff was

an invitee on property that defendants owned and/or operated." *Id.* at *20.

Here, the Diocese of Brooklyn and St. Mary's breached the duties they owed to Jeanne as

a student and invitee by failing to exercise reasonable care to safely manage the priests under their

employ, direction, and control tasked with educating St. Mary's students and minor parishioners,

like Jeanne. FAC at ¶¶ 16, 18, 19, 20, 27, 40-49, 75, 88, 100, 103, 104, 115. Defendants knowingly

allowed Father Campbell—a priest known to be uncomfortably touchy—unfettered access to ten-

year-old girl in his bedroom three to four times a week. *Id.*

Moreover, in *Caroleo v. Roman Catholic Diocese of Brooklyn*, the Diocese of Brooklyn

and the Franciscan Brothers "argue[d] that they had no notice of [the dean's] actions," but Judge

Silver held both defendants "failed to conclusively establish their lack of knowledge as a matter of law." *Id*. at *21. As such, Judge Silver allowed plaintiff's negligence claims survive defendants' motions to dismiss noting "[d]iscovery will be necessary before the parties' significant disputes on the issue of notice can be reconciled." *Id*. at *21.

Indeed, in *Ehrens v. Lutheran Church*, the Second Circuit affirmed a district court's grant of summary judgment ***after*** the completion of discovery, where the plaintiff identified no admissible evidence to establish the church had notice of a pastor's proclivities to commit sexual assault, and the incidents were perpetrated at the victim's home and the pastor's home, and not on church property. 385 F.3d 232, 235–36 (2d Cir. 2004). *See also Osvaldo D. v. Rector Church Wardens & Vestrymen of the Par. of Trinity Church of New York*, 834 N.Y.S.2d 94 (2007) (summary judgment granted after the plaintiff "failed to raise a factual issue as to whether, at the time of his hiring, Trinity Church was on notice of facts triggering a duty to inquire further"); *Ige v. Command Sec. Corp.*, No. 99-CV-6916, 2002 WL 720944, at *10 (E.D.N.Y. Mar. 12, 2002) (summary judgment granted after plaintiff could not provide any evidentiary support the employer knew or should have known of the employee's propensity for the injury-causing conduct); *O'Neil v. Roman Cath. Diocese of Brooklyn*, 949 N.Y.S.2d 447, 449 (2012) (summary judgment granted after plaintiff failed to raise a triable issue of fact in opposition to the Diocese defendants showing that they lacked either actual or constructive knowledge of the visiting priest's propensity to engage in discriminatory conduct and, upon learning of his conduct, acted promptly to redress it).

Here, Jeanne's FAC contains at least ten factual allegations that allow a factfinder to plausibly infer—if not conclude—Defendants had notice of Father Campbell propensities and acts, yet neither took any measures to prevent him from sexually abusing Jeanne three to four times a week, for six years:

1. Father Campbell was regarded and observed at St. Mary's as an uncomfortably touchy priest. FAC at ¶ 27.

2. The nuns assigned to St. Mary's—who were also Jeanne's teachers—knew Father Campbell was sending Jeanne to the convent to do errands for him and spending three to four afternoons alone with Jeanne in the St. Mary's rectory. *Id.* at ¶¶ 28, 29, Exhibit 1.

3. Sister Mary Anselm, Jeanne's teacher, noticed a major change in Jeanne's behavior— once Jeanne started spending afternoons alone with Father Campbell, Jeanne started "acting up" for the first time at St. Mary's. *Id.* at ¶¶ 30-33.

4. Nuns, priests, and other employees and agents of the Diocese of Brooklyn and St. Mary's observed Jeanne walking to, entering, exiting St. Mary's rectory three to four afternoons a week in plain sight. *Id.* at ¶¶ 29, Exhibit 1.

5. When Jeanne arrived at St. Mary's rectory, she rang a doorbell which alerted the housekeeper (and others) to her presence; because Father Campbell summoned Jeanne so frequently, the housekeeper instantly recognized Jeanne and let her take housekeeping's entryway to avoid the housekeeper having to accompany Jeanne, as she would a "regular" guest, the long way to the rectory. *Id.* at ¶¶ 34-36, Exhibit 1.

6. When Father Campbell summoned Jeanne to the rectory, even if Jeanne took the housekeeping's passageway, Jeanne passed by other priests and visitors who saw Father Campbell seclude Jeanne in his bedroom three to four afternoons a week. *Id.* at ¶¶ 37-39.

7. Instead of conversing with Jeanne in the communal areas of the rectory, other Diocese of Brooklyn priests employed at St. Mary's saw Father Campbell take Jeanne to his private office in the rectory—where he had a bar and sleeping area/bed. *Id.* at ¶¶ 37-41.

8. Father Campbell continued to sexually abuse Jeanne on a weekly basis for six years. *Id.* at ¶¶ 3, 49.

9. When Jeanne told a priest at Mater Christi Diocesan High School in Queens, New York, a school within the Diocese of Brooklyn, that Father Campbell had forced Jeanne to engage in sexual acts, the priest told Jeanne she was a shameful girl to lie about a priest, and she would go to Hell for it—evidencing the widespread coverup of child sexual abuse by priests under the Diocese of Brooklyn and the scare tactics used to stop victims like Jeanne from bringing allegations to light, which thereby led to more victims and future incidents of abuse. *Id.* at ¶¶ 49-55.

10. It is well documented child sexual abuse was prevalent within Catholic institutions in the 1960's and commonly hid from the public, parents, and parishioners by moving predatory priests from parish to parish once allegations surfaced. *Id.* at ¶¶ 56, 67, 117.

Plaintiff has affirmatively stated the above before the parties have even exchanged discovery. Not only do Defendants, therefore, wrongly argue Plaintiff has failed to state a "non-conclusory" or "non-speculative" factual basis to allege notice of Father Campbell's propensity for and acts of child sexual abuse, but such an argument is premature and should be raised in a summary judgment motion, after the completion of discovery.

Taking the above into consideration, Plaintiff disagrees with Defendants' contention the FAC includes no facts to cause a reasonably prudent person to deem Father Campbell's behavior "suspicious," triggering a duty to investigate. Defendants submit a housekeeper smuggling a ten-year-old girl into the private residence of adult men through a special passageway three to four afternoons a week, to then be handed off and locked in a bedroom for hours at a time, is "innocent" behavior. Although they take this position, a factfinder could plausibly infer the priests, nuns, housekeeper, and Defendants' other agents and employees knew or should have known an uncomfortably touchy man spending hours alone with an adolescent girl in his bedroom raises red flags. If Father Campbell's proclivities and acts with Jeanne were not nefarious, why were they done behind closed doors and not in the communal area of the rectory, where other adults were present?

Sister Mary Anselm, St. Mary's housekeeper, and other priests and nuns under the control, supervision, and employ of the Diocese of Brooklyn and St. Mary's had an opportunity to observe the warning signs and risks to Jeanne raised by Father Campbell's history and behavior three to four times a week for six years. Defendants' agents and employees should have been especially suspicious of Father Campbell's bizarre conduct given the coinciding shift in Jeanne's behavior.

A factfinder can also plausibly conclude Father Campbell was only able to continue sexually abusing Jeanne for six years because many of Defendants' agents and employees—

including Sister Mary Anselm, St. Mary's housekeeper, and other priests and nuns under the control, supervision, and employ of the Diocese of Brooklyn and St. Mary's deliberately turned a blind eye, covered up, and/or condoned the incidents of abuse. This "smack[s] of intentional wrongdoing" and "evince[s] a reckless disregard to the rights of others" by the Diocese of Brooklyn and St. Mary's—constituting gross negligence. *C.Q. v. Estate of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *8 (quoting *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)). Accordingly, Jeanne's negligence and gross negligence claims prevail.

### B. <u>Plaintiff States a Claim for Negligent Training/Retention/Supervision.</u>

Under New York law, plaintiffs can sue an employer for negligent retention or supervision if the employer "'knew or should have known' of [the employee's] 'propensity for the conduct which caused [their] injury.'" *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 335 (E.D.N.Y. 2012) (quoting *Bumpus v. New York City Transit Auth.*, 851 N.Y.S.2d 591, 591–92 (2d Dep't 2008)). "[I]n addition to the standard elements of negligence," a plaintiff alleging negligent hiring, retention, supervision, and direction must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Poly Prep*, 2021 WL 4310891, at *11 (citations omitted); *see also Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791 (2d Dept 1997)).

In addition to the standard negligent elements, discussed *supra*, Jeanne has alleged (1) Father Campbell was supervised, controlled, and employed by the Diocese of Brooklyn and St. Mary's, *see, e.g.,* FAC at ¶¶ 5, 6, 15, 78, 84, 104.; (2) at a minimum, Defendants' priests, nuns, employees, and agents were on notice of Father Capua's sexual propensities and/or acts of child

sexual abuse, listed *supra*, and (3) the incidents of abuse occurred in a rectory owned and operated by Defendants, *see, e.g., id*. at ¶¶ 6, 20, 37-39, 78.

Contrary to Defendants' assertions, there is no statutory requirement that causes of action sounding in negligent hiring, negligent retention, or negligent supervision be pleaded with heightened specificity. *Kenneth R.,* 654 N.Y.S.2d 791, 793 (1997). "[I]n instances where an employer cannot be held vicariously liable for its employee's torts, the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision. *Id.*

Here, the well-pleaded facts allow the Court to infer more than the mere possibility of misconduct—Jeanne was a foreseeable and preventable victim. The fact Jeanne disclosed she was sexually abused by Father Campbell as a high school student at Mater Christi Diocesan High School, and the priest told Jeanne it was "shameful" to "lie about a priest" and she would "go to Hell" for it speaks to the Diocese of Brooklyn's concerted effort to coverup acts of child sexual abuse and to protect diocesan priests. FAC at ¶¶ 51-55. As this Court has noted, "affirmative misrepresentations or deceitful conduct designed to keep a potential plaintiff from gaining knowledge of an essential element of a viable cause of action for a claim of negligent retention or supervision by an employer of a sexual-predator employee [is] a game-changer." *Zimmerman v. Poly Prep Country Day Sch*., 888 F. Supp. 2d 317, 339 (E.D.N.Y. 2012).

The Diocese of Brooklyn cites *France v. Touro College* for the proposition Jeanne has not established an employer-employee relationship between the Diocese of Brooklyn and Father Campbell—despite conceding Father Campbell was a priest under the Diocese of Brooklyn assigned to St. Mary's, which is within the Diocese of Brooklyn. There, this Court recommended a security guard plaintiff be given leave to amend after her complaint did not establish the

university her employer assigned her to patrol was a "joint employer" for purposes of Title VII.

No. 14-CV-4613, 2016 WL 1105400, at *8 (E.D.N.Y. Feb. 16, 2016). The Court reasoned:

> Plaintiff's failure to allege any facts relating to the terms and conditions under which she worked, such as who set her hours and directed her assignments, or even the nature and extent to which Linnen [Touro College's "Maintenance Manager"] supervised her day-to-day work — all facts at least partially within plaintiff's knowledge without the need for further discovery — is fatal to her claim of joint employer status.

*Id.* Important to the court's analysis, "few, if any, factual allegations [supported] her claim that the university controlled the terms and conditions of her employment" and therefore was a joint employer with the security guard team the plaintiff was hired by and reported to. *Id.*

Pursuant to the joint employer doctrine, "an employee may be 'formally employed by one entity,' but 'assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity.'" *Id.* (citing *Arculeo v. On–Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir.2005). "'A joint employer relationship may be found to exist where there is sufficient evidence that the [defendant] had immediate control over the other company's employees.'" *Id.* (citing *N.L.R.B. v. Solid Waste Servs., Inc*., 38 F.3d 93, 94 (2d Cir.1994)). "Relevant factors include commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *Id.* But "'[t]he extent of the employer's right to control the means and manner of the worker's performance is the most important factor[,]" and other factors "are then of marginal importance." *Id*. (internal quotations omitted).

Plaintiff's FAC establishes both the Diocese of Brooklyn and St. Mary's exercised joint control over Father Campbell's "performance," therefore, the Diocese of Brooklyn's reliance on *France v. Touro College* is misguided for this reason—among at least two others. Plaintiff clearly states, "Father Campbell was employed as a diocesan priest at St. Mary's when [Plaintiff's' abuse

occurred]." FAC at ¶5.[3] Plaintiff submits the failure of St. Mary's and the Diocese "to exercise reasonable care to control Father Campbell" is what led to his "sexual abuse of [Jeanne] while on Defendants' premises." *Id*. at ¶ 78. Further, Father Campbell, a Diocese of Brooklyn priest, was working ***and living*** at St. Mary's—clearly, both Defendants controlled his performance and whereabouts. *Id*. at ¶¶ 6, 35, 38, 40, 78, 80.

Also, unlike in *France v. Touro College,* Jeanne does not have knowledge without the need for further discovery of facts relating to the terms and conditions of Father Campbell's employment for the obvious reason Jeanne was a child when the abuse occurred. To penalize Jeanne because she does not know how Father Campbell was paid, who determined his schedule and assignments—among other facts within Defendants' sole possession—would be a grave miscarriage of justice.

Finally, it stands to reason Touro College would remain in business if it did not have third party security guards to patrol its premises. The same cannot be said here—St. Mary's would cease to exist as a Roman Catholic parish and school without Roman Catholic priests to educate its students and minor parishioners and operate its premises generally. Defendants do not dispute "St. Mary's is a 'religious entity within the Diocese of Brooklyn, which operates both a parish and a school . . . [and] Father John Campbell was a Roman Catholic priest at the Parish." *See* Defendant St. Mary's Motion to Dismiss at page 2.

In *Caroleo v. Roman Catholic Diocese of Brooklyn*, Judge Silver held the Diocese of Brooklyn and the Franciscan Brothers—two separate legal entities—owed the plaintiff a duty of

---

[3] Plaintiff also alleges: "Father Campbell was a diocesan priest employed by St. Mary's and was under Defendants' direct supervision, employ, and control when he committed the wrongful acts alleged herein. Father Campbell engaged in the wrongful conduct while acting in the course and scope of his employment with the Diocese of Brooklyn and St. Mary's and/or accomplished the sexual abuse by virtue of his job-created authority." FAC at ¶ 84; *see also id.* at ¶¶ 15-17.

care as an invitee at St. Francis Preparatory School as it was "property that defendants owned and/or operated." 2021 NY Slip Op 31445(U) (App. Div. 2nd. 2021). *In DiGiorgio v. Roman Catholic Diocese of Brooklyn*, Judge Silver reached the same conclusion: the Diocese of Brooklyn and St. Rose of Lima Church—two separate legal entities—owed the plaintiff a duty of care as an invitee at St. Rose of Lima Church, where the incidents of abuse occurred, because it was "property that defendants owned and/or operated." 2021 N.Y. Slip Op. 31378 (N.Y. Sup. Ct. 2021).

Here, Plaintiff is alleging the same—the Diocese of Brooklyn and St. Mary's together owned and/or operated the premises of St. Mary's and jointly employed diocesan priests, including Father Campbell, to instruct St. Mary's students and minor parishioners. As stated, this is a widely accepted conclusion. If the Diocese of Brooklyn could point to a case that stands for the proposition a diocese does not employ its priests, it would. That case does not exist—and the Diocese of Brooklyn's argument it did not exercise joint control, supervision, and employ of Father Campbell defies logic.

Defendants argue any negligence claims they are vicariously liable under respondeat superior for Father Campbell's conduct fail because sexual assault falls out of the scope of an employee's employment. But "[c]ontrary to defendants' suggestions, plaintiff is not alleging that the Diocese and [St. Mary's] are vicariously liable under respondeat superior for [Father Campbell's] actions. Rather, the gravamen of plaintiff's negligence claim is that the Diocese and [St. Mary's] owed a duty of care to plaintiff" because she was a student and "an invitee on property that defendants owned and/or operated." *Caroleo,* 2021 NY Slip Op 31445(U).

In several recent C.V.A. cases, Judge Silver has explained even if, arguendo, the defendants cannot be held vicariously liable for intentional torts, "they can be held vicariously liable for negligence committed in allowing such abuse to take place when a duty of reasonable care existed

to safely manage the subject educational facilities." *Id.; DiGiorgio*, 2021 N.Y. Slip Op. 31378 (negligence claims allowed to proceed against the Diocese of Brooklyn and St. Rose of Lima Church); *Ark 51 v. Archdiocese of New York*, No. 950047/2019, 2021 WL 2719319, at *3 (N.Y. Sup. Ct. July 01, 2021) (negligence claims allowed to proceed against the Salesians on the same theory).

The Diocese of Brooklyn points to two cases—with very different facts—where the plaintiff's negligent training/retention/supervision claim failed because the fit between the injurious conduct and scope of employment was off. First, the Diocese cites *Doe v. Abdulaziz Bin Fahd Alsaud*, where a victim of a sexual assault—though not a C.V.A. case—sued the employer of her rapist, who was a member of a Saudi prince's entourage. 12 F. Supp. 3d 674 (S.D.N.Y. 2014). She alleged the employee's duties involved luring women to the prince. *Id.* at 677-9. But the *Alsaud* court held the plaintiff did not establish a sufficient nexus between those duties (luring women for the prince) and the employee's own sexual misconduct (raping the plaintiff), to state a claim for negligent hiring/supervision/retention. *Id.* at 677-9. Second, in *Ortiz v. Parkchester North Condominiums*, the court held even if the plaintiff, who was injured by patrolmen during an arrest, had alleged the security guards had violent or dishonest propensities, "the FAC would still be insufficient [to state a negligent training/retention/supervision claim] because it contains no allegations that Defendant[] [patrolmen] acted outside the scope of their employment. No. 16-CV-9646, 2018 WL 2976011, at *10 (S.D.N.Y. June 13, 2018). "To the contrary, the FAC specifically alleges that the acts of Defendants [] occurred while they were 'acting within the scope of their employment." *Id.*

In contrast, here, Plaintiff alleges Father Campbell was able to gain unfettered access to meet, groom, and molest Jeanne ***because*** of his job-created authority. Thus, Father Campbell was

acting within the scope of his employment when the incidents of abuse occurred at St. Mary's rectory—and the incidents would not have occurred but for the fact Father Campbell gained the trust of Jeanne and her mother due to the fact he was a priest, and they expected him—along with the other priests, nuns, employees, and agents of the Diocese of Brooklyn and St. Mary's—to embody the ideals of the Roman Catholic Church. FAC at ¶¶ 24, 74.

"Where an employer cannot be held vicariously liable for its employee's torts [because they occur outside the scope of his employment], the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Bouchard v. New York Archdiocese*, 719 F. Supp. 2d 255, 260–61 (S.D.N.Y. 2010) (citing *Kenneth R.*, 654 N.Y.S.2d 791 (2d Dep't 1997)). "A claim for negligent supervision or retention arises when an employer places an employee in a position to cause foreseeable harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." *Vione v. Tewell*, 820 N.Y.S.2d 682, 687 (N.Y.Sup.Ct.2006). A negligent retention theory is, therefore, "viable where the school had notice of proper allegations of a teacher's inappropriate contact with a student, and failed to investigate the allegations." *Jones ex rel. Jones v. Roman Cath. Archdiocese of New York*, 918 N.Y.S.2d 398 (Sup. Ct. 2010).

### C.  <u>Plaintiff States a Claim for Premises Liability</u>.

"[U]nder a theory of premises liability, it is the duty of a property owner to protect plaintiff from foreseeable harm caused by third persons." *Reno v. Churchville-Chili Cent. Sch. Dist.*, 148 N.Y.S.3d 683 (N.Y. Sup. Ct. 2021) (citations omitted); *see also Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451 (N.Y. 1980). The duty has been applied "not only in cases where the assailant was a stranger to the defendant, but also, as in the case here, where the underlying act was committed by an employee of the establishment." *JG v. Goldfinger*, 79 N.Y.S.3d 1 (App. Div. 2018).

In addition to their duty to protect Jeanne as a student, as discussed above, Defendants had a duty to protect Jeanne as property owners. This duty was breached by allowing Father Campbell to work at St. Mary's where he had unfettered access to meet, groom, and molest Jeanne upon secluding her in his private quarters in the St. Mary's rectory. FAC at ¶¶ 16, 18, 19, 20, 27, 40-49, 75, 88, 100, 103, 104, 115. Thus, the FAC explains how Father Campbell presented a foreseeable risk to Jeanne, and, unlike the victim in *Maheshwari v. City of New York*, Jeanne was not subjected to "a random act of violence." 2 N.Y.3d 288, 294 (N.Y. 2004). Though Defendants argue they cannot be held vicariously liable for the intentional torts committed by Father Campbell, they can be held vicariously liable for negligence committed in allowing such abuse to take place when a duty of reasonable care existed to safely manage the subject educational facilities. *See Caroleo,* 2021 NY Slip Op 31445(U).

Moreover, Defendants contend they had no notice of Father Capua's propensities and/or actions, but they have not conclusively established their lack of knowledge as a matter of law; Jeanne has plausibly alleged Defendants **_were_** on notice of Father Campbell's propensities and actions. And, as Judge Silver ordered in *Caroleo v. Diocese of Brooklyn*, Plaintiff seeks additional discovery, which remains in Defendants' sole possession, to further reconcile the issue of notice raised by Defendants. *Id.*

### D.   Plaintiff States a Claim for Breach of Fiduciary Duty.

Courts have articulated a fiduciary duty exists when a plaintiff's relationship with a church extends beyond that of an ordinary parishioner. *See Doe v. Holy See (State of Vatican City)*, 17 A.D. 3d 793, 796 (N.Y. App. Div. 3d Dep't 2005). A fiduciary relationship can be established upon a showing that a congregant's relationship with a church entity resulted in "de facto control

and dominance" when the congregant was "vulnerable and incapable of self-protection regarding the matter at issue." *Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 379 (N.Y. 2008).

Here, Defendants exercised additional de facto control and dominance over Jeanne in her capacity as a minor parishioner, which created a fiduciary relationship beyond Defendants' established duties to Jeanne as a student and invitee at St. Mary's. The FAC alleges that there existed a deep fiduciary relationship of trust, confidence and reliance between Plaintiff and Father Campbell. This relationship arose when Father Campbell held himself out as able to provide a safe and secure environment for Plaintiff; Plaintiff's mother entrusted Plaintiff to Defendants' care and expected that Plaintiff would be safe and properly supervised in an environment free from harm and abuse; Plaintiff was a vulnerable minor, and unable to protect herself; and Defendants affirmatively assumed a position of empowerment over Plaintiff.

This claim is not duplicative, and the existence of a fiduciary duty is a fact specific question to be determined by the factfinder, such that breach of fiduciary duty claims should not be dismissed before the parties have the opportunity to conduct discovery. *See Doe v. Holy See*, 17 AD3d at 793.

## CONCLUSION

Plaintiff respectfully requests the Court deny Defendants' Motions to Dismiss in their entirety. In the alternative, Plaintiff requests the opportunity to amend her pleadings, should they be found in any way deficient by the Court.


Dated: June 12, 2022

Respectfully Submitted,

*/s/ Ashley M. Pileika*
Ashley M. Pileika

New York Bar No. 974605
ashley@darrenwolf.com
Darren Wolf*
Texas State Bar No. 24072430
darren@darrenwolf.com
**Law Office of Darren Wolf, P.C.**
1701 N. Market St., Suite 210
Dallas, Texas 75202
P:  214-346-5355
F:  214-346-5909
*Admitted pro hac vice*

*Attorneys for Plaintiff*